SRD: USAO#2022R00155
hmg.2.25.26



FILED
LOGGED ___ ENTERED
___ RECEIVED

MAR 12 2026

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | CRIMINAL NO. MJM-26-96 |
| v. : | |
| **JACOB RAPPAPORT,** : | Count One: 18 U.S.C. § 1349 (Conspiracy to Commit Bank Fraud) |
| : | Forfeiture: 18 U.S.C. § 982(a)(2) and |
| **Defendant.** : | (b)(1); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c) |
| : | |

…oooOooo...

## INFORMATION

### COUNT ONE
### 18 U.S.C. § 1349 – Conspiracy to Commit Bank Fraud

The United States Attorney for the District of Maryland charges, at all times relevant to this Information:

### INTRODUCTION

1. The defendant, **JACOB RAPPAPORT ("RAPPAPORT ")** was an attorney in Towson, Maryland.

2. Alexander SCHULTZ ("SCHULTZ") and Person #1 were the owners of Limitless Management, LLC ("Limitless Management"), a company that bought, sold, and managed real estate in Maryland.

3. **RAPPAPORT** represented SCHULTZ, Person #1, and Limitless Management.

4. Coventry Manor was an apartment complex located in Baltimore City, Maryland. Coventry Manor was owned by a collection of corporate entities, one of which was called Coventry Realty, LLC and was controlled by SCHULTZ, Person #1, and others.

5. In or around January 2020, those corporate entities purchased Coventry Manor for $5.5 million. To facilitate the purchase, Coventry Realty LLC received a $4.6 million loan

from Bank A.

6. In or around March 2021, Coventry Realty, LLC obtained a new loan from Bank B in the approximate amount of $6.2 million for Coventry Manor. The loan from Bank B paid off the original loan issued from Bank A. The collective ownership of Coventry Manor by the corporate entities including Coventry Realty, LLC will hereinafter be referred to as Coventry Realty.

7. Bank A was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"), and it was a member of the Federal Home Loan Bank System. Bank A was headquartered in Richmond, Virginia.

8. Bank B was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"), and it was a member of the Federal Home Loan Bank System. Bank B was headquartered in McLean, Virginia.

9. Lender A was a private real estate lender based in New York, New York. Lender A mainly provided financing products for real estate investors. Lender A was a financial institution within the meaning of Title 18, United States Code, Section 20, as it was a mortgage lending business who financed and refinanced any debt secured by an interest in real estate and whose activities affected interstate and foreign commerce.

## THE CONSPIRACY AND THE SCHEME TO DEFRAUD

10. From in or about September 2021 to in or about April 2022, in the District of Maryland and elsewhere, the Defendant,

**JACOB RAPPAPORT,**

along with SHULTZ, Person #1, and others known and unknown, did knowingly and willfully combine, conspire, confederate and agree to execute and attempt to execute a scheme and artifice to defraud a financial institution insured by the Federal Deposit Insurance Corporation, as defined in 18 U.S.C. § 20, by means of materially false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS OF THE CONSPIRACY
## AND THE SCHEME AND ARTIFICE TO DEFRAUD

**Coventry Manor**

11. It was part of the conspiracy and scheme and artifice to defraud that in or around December 2021, Coventry Realty agreed to sell Coventry Manor to Buyer #1.

12. It was further part of the conspiracy and scheme to defraud that SHULTZ, Person #1, and other parties agreed that Buyer #1 would assume the Bank B loan rather than seek new financing, which meant that Buyer #1 would receive the property along with the terms and balance of the Bank B loan.

13. It was further part of the conspiracy and scheme to defraud that SCHULTZ, Person #1, and a representative of Buyer #1 separately entered into an agreement that was not disclosed to Bank B. The agreement, titled "Agreement to Contract of Sale," was signed by SCHULTZ and the representative of Buyer #1, and stated the true purchase price of Coventry Manor was approximately $6.9 million.

14. It was further part of the conspiracy and scheme and artifice to defraud that **RAPPAPORT** prepared two separate contracts for sale as part of this transaction. The first contract was presented to Bank B and reflected that Buyer #1 would purchase Coventry Manor from Coventry Realty for $7.8 million. This side agreement, titled "Agreement to Contract of Sale," was signed by SCHULTZ and the representative of Buyer #1, and stated the true purchase of Coventry Manor was approximately $6.9 million. It further stated that Coventry Realty would provide "seller credits" of approximately $847,619.05 to account for the difference between the fake purchase price of $7.8 million and the actual purchase price of $6.9 million—all of which were material facts that should have been disclosed to Bank B. The difference in the sale price was material to Bank B and was knowingly and purposely altered on the contract of sale.

15. It was further part of the conspiracy and scheme and artifice to defraud that **RAPPAPORT** participated in conversations with SCHULTZ, Person #1, and representatives of Buyer #1 to plan and discuss the scheme.

16. It was further part of the conspiracy and scheme to defraud that, when the attorney who initially represented Buyer #1 indicated that he would not participate in the scheme, **RAPPAPORT** assisted in identifying a different lawyer for Buyer #1 who would participate.

17. It was further part of the conspiracy and scheme to defraud that prior to settlement, **RAPPAPORT**, SCHULTZ, and others determined that only $512,251.12 of the agreed upon seller credits could be reflected on the HUD-1 Settlement Statement as concessions from the seller to the buyer. Among the credits that would be reflected on the HUD-1 Settlement Statement was a fictitious "Reno Credit," in the amount of $85,000 used as mechanism to lower the amount owed by Buyer #1 at closing. Unbeknownst to Bank B, **RAPPAPORT**, Schultz, and others agreed that the seller credit deficit of $335,367.93 would be paid to Buyer #1 outside of closing and would not be disclosed to Bank B. The payment outside of closing was material to

4

Bank B and knowingly and purposely omitted from the information provided to Bank B.

18. It was further part of the conspiracy and scheme to defraud that on or around April 14, 2022, settlement for the sale of Coventry Manor from Coventry Realty to Buyer #1 was conducted. The executed HUD-1 Settlement Statement reflected a fraudulent sales price of $7.8 million, a fraudulent "Reno Credit," of $85,000 and a "Seller Fee," of $335,367.93 that was to be paid to the law firm at which **RAPPAPORT** was employed.

19. It was further part of the conspiracy and scheme to defraud that on or about April 14, 2022, a wire transfer was initiated from Settlement Company A to the Attorney Trust Account of **RAPPAPORT** in the amount $351,617.93. The wire transfer details stated that the wire transfer was for Seller Fee/Attorney Fee related to Coventry Manor Apartment. As a result of this transaction, **RAPPAPORT** was paid $16,250.

20. It was further part of the conspiracy and scheme to defraud that on or around April 19, 2022, a wire transfer was initiated from the Attorney Trust Account of **RAPPAPORT** to Buyer #1's company. The wire transfer was in the amount of $335,367.93, which was the same amount the parties agreed would be paid outside of closing without Bank B's knowledge, and the same amount reflected on the HUD-1 Settlement Statement as a "Seller Fee," payable to the **RAPPAPORT**'s law firm.

**Wholesale Properties**

21. It was further part of the conspiracy and scheme to defraud that in or around September 2021, SCHULTZ and Person #1 identified an additional 42 residential homes near each other in Baltimore, Maryland being sold by various sellers. SCHULTZ and Person #1 planned to "wholesale" the properties, meaning that, during the period between the contract ratification and settlement, SCHULTZ and Person #1 would find a third-party buyer to purchase the residential home portfolio for a higher amount, thus creating a profit for SCHULTZ and Person #1.

22. It was further part of the conspiracy and scheme to defraud that SCHULTZ and Person #1 negotiated a contract sales price for the identified properties of $87,500 per home or $3,675,000 collectively.

23. It was further part of the conspiracy and scheme to defraud that SCHULTZ and Person #1 agreed to sell 42 residential homes to Buyer #2. The agreed upon purchase price of the properties was $112,500 per home or $4,725,000 collectively. SCHULTZ, Person #1, and Buyer #2 agreed to fraudulently inflate the purchase price to $165,000 per home or $6,930,000 collectively. The purpose of fraudulently inflating the purchase price was to provide Buyer #2 with 100 percent financing from Lender A.

24. It was further part of the conspiracy and scheme to defraud that SCHULTZ, Person #1, and Buyer #2 agreed to provide Lender A with the fraudulently inflated purchase price of $165,000 per home or $6,930,000 collectively. Lender A was not told that the true purchase price was $112,500 per home or $4,725,000 collectively. The true purchase price and down payment were material terms to Lender A's loan decision.

25. It was further part of the conspiracy and scheme to defraud that, because Buyer #2 did not have the required down payment of approximately $2 million for closing, that Buyer

#2 would borrow the funds required from acquaintances without divulging this fact to Lender A.

26. It was further part of the conspiracy and scheme to defraud that Limitless Management and Buyer #2 agreed that the $2 million would be returned to Buyer #2 after the closing without the knowledge of Lender A or Settlement Company.

27. It was further part of the conspiracy and scheme to defraud that, to complete the scheme, **RAPPAPORT** agreed to receive the $2 million from the Settlement Company into **RAPPAPORT**'s Attorney Trust Account, then return the funds to Buyer #2's source of funds, thus concealing the source of the $2 million from the settlement company and Lender A.

28. It was further part of the conspiracy and scheme to defraud that on or around December 9, 2021, Limitless Management purchased the 42 residential homes for $3,675,000.

29. It was further part of the conspiracy and scheme to defraud that Limitless Management then sold the 42 residential homes to Buyer #1 on the same day for $6,930,000.

30. It was further part of the conspiracy and scheme to defraud that, to fund the purchase of the 42 residential homes, Buyer #1 received two loans from Lender A in the collective amount of $5,236,000. The HUD-1 Settlement Statement reflected that Buyer #2 provided $1,931,545.96 as a down payment and Limitless Management received $2,921,604.09 from the sale.

31. It was further part of the conspiracy and scheme to defraud that on or around December 13, 2021, the Settlement Company wired approximately $2.8 million to **RAPPAPORT**'s Attorney Trust Account via two wire transfers. The wire transfer details stated that the wire transfer was for, "Seller Proceeds." On the same day, a wire transfer in the amount of $2,024,000 was initiated from **RAPPAPORT**'s Attorney Trust Account to Buyer #2's source of funds.

Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982(a)(2) and (b)(1), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c) in the event of the defendant's conviction under the offense charged in Count One of this Information.

### Bank Fraud Forfeiture

2. Upon conviction of the offense alleged in Count One of this Information, the defendant,

### JACOB RAPPAPORT,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offense.

3. The property to be forfeited includes, but is not limited to, a money judgment representing the proceeds obtained from their participation in the scheme to defraud.

### Substitute Assets

4. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred, sold to, or deposited with a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 982(a)(2) and (b)(1)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

_[signature]_                  Digitally signed by SEAN DELANEY
                               Date: 2026.03.12 11:22:48 -04'00'

Kelly O. Hayes
United States Attorney
District of Maryland