——— FILED ——— ENTERED
——— LOGGED ——— RECEIVED

APR 2 2 2026

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ——— DEPUTY

## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### Introduction

JACOB RAPPAPORT ("RAPPAPORT") was an attorney in Towson, Maryland. Limitless Management, LLC ("Limitless Management") was a company that bought, sold, and managed real estate in Maryland. From 2018 through 2022, Alexander Schultz ("Schultz") was a fifty percent owner of Limitless Management. At all times relevant, Schultz's business partner, Person #1, was also a fifty percent owner of Limitless Management. RAPPAPORT represented Schultz, Person #1, and Limitless Management on various real estate transactions.

### Coventry Manor Apartment

Coventry Manor was an apartment complex located in Baltimore, Maryland. Coventry Manor was owned by a collection of corporate entities, one of which was called Coventry Realty, LLC, which was controlled by Schultz, Person #1, and others. In or around January 2020 those corporate entities purchased Coventry Manor for $5.5 million. To facilitate the purchase, Coventry Realty LLC received a $4.6 million loan from Bank A. Bank A was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"), and it was a member of the Federal Home Loan Bank System. Bank A was headquartered in Richmond, Virginia.

In or around March 2021, Coventry Realty, LLC obtained a new loan from Bank B in the approximate amount of $6.2 million for Coventry Manor. The loan from Bank B paid off the original loan issued from Bank A. Bank B was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the Federal Deposit Insurance Corporation (FDIC), and it was a member of the Federal Home Loan Bank System. Bank B was headquartered in McLean, Virginia. The collective ownership of Coventry Manor by the corporate entities including Coventry Realty, LLC is hereinafter referred to as Coventry Realty.

In or around December 2021, Schultz and Person #1 agreed to sell Coventry Manor to Buyer #1. It was agreed that Buyer #1 would assume the Bank B loan rather than seek new financing. This meant that Buyer #1 would receive the property along with the terms and balance of the Bank B loan. Assumption of a loan commonly requires that the assuming party is qualified under lender or guarantor guidelines. Buyer #1 ultimately assumed the loan as a result of the sale, which has not yet been paid off in full.

Rev. August 2018

10

RAPPAPORT, on behalf of Schultz, Person #1, and Limitless Management, prepared two separate contracts for sale as part of this transaction. The first contract was presented to Bank B reflecting that Buyer #1 would purchase Coventry Manor from Coventry Realty for $7.8 million. RAPPAPORT also drafted a side agreement that was not disclosed to Bank B. This side agreement, titled "Agreement to Contract of Sale," was signed by Schultz and the representative of Buyer #1, and stated the true purchase of Coventry Manor was approximately $6.9 million. It further stated that Coventry Realty would provide "seller credits" of approximately $847,619.05 to account for the difference between the fake purchase price of $7.8 million and the actual purchase price of $6.9 million—all of which were material facts that should have been disclosed to Bank B. Attorney #1 prepared both the $7.8 million Contract of Sale and the separate $6.9 million Agreement to Contract of Sale.

The difference in the sale price was material to Bank B and knowingly and purposely altered on the contract of sale.

RAPPAPORT took part in conversations with Schultz, Person #1, and representatives of Buyer #1 both planning and discussing the scheme. When the attorney who initially represented Buyer #1 indicated that he would not participate in the scheme, RAPPAPORT assisted in identifying a different lawyer for Buyer #1 who would participate ("Attorney #2").

Prior to settlement, it was determined by RAPPAPORT, Schultz, and others that only $512,251.12 of the agreed upon seller credits could be reflected on the HUD-1 Settlement Statement as concessions from the seller to the buyer. Among the credits that would be reflected on the HUD-1 Settlement Statement was a fictitious "Reno Credit," in the amount of $85,000 used as mechanism to lower the amount owed by Buyer #1 at closing. Unbeknown to Bank B, RAPPAPORT, Schultz, and others agreed that the seller credit deficit of $335,367.93 would be paid to Buyer #1 outside of closing and would not be disclosed to Bank B. The payment outside of closing was material to Bank B and knowingly and purposely omitted from the information provided to Bank B.

On or around April 14, 2022, settlement for the sale of Coventry Manor from Coventry Realty to Buyer #1 was conducted. The executed HUD-1 Settlement Statement reflected a fraudulent sales price of $7.8 million, a fraudulent "Reno Credit," of $85,000 and a "Seller Fee," of $335,367.93 that was to be paid to the law firm at which RAPPAPORT was employed. On or about April 14, 2022, a wire transfer was initiated from Settlement Company A to the Attorney Trust Account of RAPPAPORT in the amount $351,617.93. The wire transfer details stated that the wire transfer was for Seller Fee/Attorney Fee related to Coventry Manor Apartment. As a result of this transaction, RAPPAPORT was paid $16,250.

On or around April 19, 2022, a wire transfer was initiated from the Attorney Trust Account of RAPPAPORT to Buyer #1's company. The wire transfer was in the amount of $335,367.93, which was the same amount the parties agreed would be paid outside of closing without Bank B's knowledge, and the same amount reflected on the HUD-1 Settlement Statement as a "Seller Fee," payable to the RAPPAPORT's law firm.

As of the date of this plea agreement, the latest tax assessment of Coventry Manor was sufficient so that, were the properties sold for that value, there would not be a loss to Bank B.

## Residential Home Wholesale

In addition to purchasing and managing multi-family apartment complexes, Schultz and Person #1 were in the business of wholesaling portfolios of residential homes. Schultz and Person #1 would identify homes being sold for under market value and place contracts on these residences. During the period between the contract ratification and settlement, Schultz and Person #1 would find a third-party buyer to purchase the residential home portfolio at or near market value, thus creating a profit for Schultz and Person #1. The settlements for these transactions usually took place on the same day; therefore, Schultz and Person #1 would own the properties for only a short period of time.

Lender A is a private real estate lender based in New York, New York. Lender #1 mainly provides financing products for real estate investors. In or around September 2021, Schultz and Person #1 identified 42 residential homes near each other in Baltimore, Maryland being sold by various sellers. Schultz and Person #1, with the assistance of RAPPAPORT, negotiated a contract sales price of $87,500 per home or $3,675,000 collectively.

Schultz and Person #1 agreed to sell the 42 residential homes to Buyer #2. The agreed upon purchase price of the properties was $112,500 per home or $4,725,000 collectively. Schultz, Person #1, and Buyer #2 agreed to fraudulently inflate the purchase price to $165,000 per home or $6,930,000 collectively. The purpose of fraudulently inflating the purchase price was to provide Buyer #2 with 100 percent financing from Lender A.

Schultz, Person #1, and Buyer #2 agreed to provide Lender A with the fraudulently inflated purchase price of $165,000 per home or $6,930,000 collectively. Lender A was not told that the true purchase price was $112,500 per home or $4,725,000 collectively. The true purchase price and down payment were material terms to Lender A's loan decision. Buyer #2 was required to provide a down payment of approximately $2 million at closing, however, he did not have funds available. Unbeknown to Lender A, Buyer #2 devised a scheme to produce "show money" that would be provided to the settlement company to satisfy the down payment requirement. Buyer #2 arranged to borrow the funds required. Further, RAPPAPORT, Schultz, Person #1, and Buyer #2 agreed that the $2 million would be returned to Buyer #2's source of funds after the closing without the knowledge of the lender or Settlement Company. To complete the scheme, RAPPAPORT agreed to receive the $2 million from the Settlement Company into RAPPAPORT's Attorney Trust Account, then return the funds to Buyer #2's source of funds, thus concealing the source of the $2 million from the settlement company and Lender A.

On or around December 9, 2021, Schultz and Person #1 purchased the 42 residential homes for $3,675,000. Schultz and Person #1 then sold the 42 residential homes to Buyer #2 on the same day for $6,930,000. To fund the purchase of the 42 residential homes, Buyer #2 received two loans from the Lender in the collective amount of $5,236,000. The HUD-1 Settlement Statement reflected that Buyer #2 provided $1,931,545.96 as a down payment and

Rev. August 2018

12

Schultz and Person #1 received $2,921,604.09 from the sale. As a result of this transaction, RAPPAPORT was paid $5,500.

On or around December 13, 2021, the Settlement Company wired approximately $2.8 million to RAPPAPORT's Attorney Trust Account via two wire transfers. The wire transfer details stated that the wire transfer was for, "Seller Proceeds." On the same day, a wire transfer in the amount of $2,024,000 was initiated from RAPPAPORT's Attorney Trust Account to Buyer #2's source of funds.

SO STIPULATED:

Digitally signed by SEAN DELANEY
Date: 2025.12.15 10:19:02 -05'00'

Sean R. Delaney
Assistant United States Attorney

Jacob Rappaport
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including this Factual Stipulation, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement and Factual Stipulation is an informed and voluntary one.

Andrew C. White, Esq.
Counsel for Defendant