**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO.  MJM-26-96 |
| JACOB RAPPAPORT, | |
| Defendant. | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by undersigned counsel, hereby files the following sentencing memorandum in support of the agreed-upon sentence of 15 months imprisonment, a sentence sufficient but not greater than necessary to fulfill the requirements of 18 U.S.C. § 3553(a). The Defendant used his position as a lawyer to facilitate fraud that posed a significant risk to financial institutions. There is no doubt that the Defendant knew what he was doing and that his crime was not a single lapse in judgment. The evidence demonstrates that he simply made the determination that the risk was outweighed by the benefits of both his modest fee and, more broadly, of maintaining a satisfied client base. While the consequences of a 15-month sentence for a professional with a family who will likely lose his license because of this crime are harsh, they are appropriate and called for given the seriousness of his offense and the need for deterrence.

## I.   BACKGROUND

The facts are this guilty plea are not in dispute. Defendant Jacob Rappaport ("Rappaport") was an attorney in Towson, Maryland. Limitless Management, LLC ("Limitless Management") was a company that bought, sold, and managed real estate in Maryland. From 2018 through 2022, Alexander Schultz ("Schultz") was a fifty percent owner of Limitless Management. At all times relevant, Schultz's business partner, Person #1, was also a fifty percent owner of Limitless

1

Management. Rappaport represented Schultz, Person #1, and Limitless Management on various real estate transactions.

## Coventry Manor Apartment

Coventry Manor was an apartment complex located in Baltimore, Maryland. Coventry Manor was owned by a collection of corporate entities, one of which was called Coventry Realty, LLC, which was controlled by Schultz, Person #1, and others. In or around January 2020 those corporate entities purchased Coventry Manor for $5.5 million. To facilitate the purchase, Coventry Realty LLC received a $4.6 million loan from Bank A. Bank A was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the Federal Deposit Insurance Corporation ("FDIC"), and it was a member of the Federal Home Loan Bank System. Bank A was headquartered in Richmond, Virginia.

In or around March 2021, Coventry Realty, LLC obtained a new loan from Bank B in the approximate amount of $6.2 million for Coventry Manor. The loan from Bank B paid off the original loan issued from Bank A. Bank B was a financial institution within the meaning of Title 18, United States Code, Section 20, as its deposits were insured by the FDIC, and it was a member of the Federal Home Loan Bank System. Bank B was headquartered in McLean, Virginia. The collective ownership of Coventry Manor by the corporate entities including Coventry Realty, LLC is hereinafter referred to as Coventry Realty.

In or around December 2021, Schultz and Person #1 agreed to sell Coventry Manor to Buyer #1. It was agreed that Buyer #1 would assume the Bank B loan rather than seek new financing. This meant that Buyer #1 would receive the property along with the terms and balance of the Bank B loan. Assumption of a loan commonly requires that the assuming party is qualified under lender or guarantor guidelines. Buyer #1 ultimately assumed the loan as a result of the sale,

which has not yet been paid off in full.

Rappaport, on behalf of Schultz, Person #1, and Limitless Management, prepared two separate contracts for sale as part of this transaction. The first contract was presented to Bank B reflecting that Buyer #1 would purchase Coventry Manor from Coventry Realty for $7.8 million. Rappaport also drafted a side agreement that was not disclosed to Bank B. This side agreement, titled "Agreement to Contract of Sale," was signed by Schultz and the representative of Buyer #1, and stated the true purchase of Coventry Manor was approximately $6.9 million. It further stated that Coventry Realty would provide "seller credits" of approximately $847,619.05 to account for the difference between the fake purchase price of $7.8 million and the actual purchase price of $6.9 million—all of which were material facts that should have been disclosed to Bank B. Attorney #1 prepared both the $7.8 million Contract of Sale and the separate $6.9 million Agreement to Contract of Sale. The difference in the sale price was material to Bank B and knowingly and purposely altered on the contract of sale.

Rappaport took part in conversations with Schultz, Person #1, and representatives of Buyer #1 both planning and discussing the scheme. When the attorney who initially represented Buyer #1 indicated that he would not participate in the scheme, Rappaport assisted in identifying a different lawyer for Buyer #1 who would participate ("Attorney #2").

Prior to settlement, it was determined by Rappaport, Schultz, and others that only $512,251.12 of the agreed upon seller credits could be reflected on the HUD-1 Settlement Statement as concessions from the seller to the buyer. Among the credits that would be reflected on the HUD-1 Settlement Statement was a fictitious "Reno Credit," in the amount of $85,000 used as mechanism to lower the amount owed by Buyer #1 at closing. Unbeknown to Bank B, Rappaport, Schultz, and others agreed that the seller credit deficit of $335,367.93 would be paid

to Buyer #1 outside of closing and would not be disclosed to Bank B. The payment outside of closing was material to Bank B and knowingly and purposely omitted from the information provided to Bank B.

On or around April 14, 2022, settlement for the sale of Coventry Manor from Coventry Realty to Buyer #1 was conducted. The executed HUD-1 Settlement Statement reflected a fraudulent sales price of $7.8 million, a fraudulent "Reno Credit," of $85,000 and a "Seller Fee," of $335,367.93 that was to be paid to the law firm at which Rappaport was employed. On or about April 14, 2022, a wire transfer was initiated from Settlement Company A to the Attorney Trust Account of Rappaport in the amount $351,617.93. The wire transfer details stated that the wire transfer was for Seller Fee/Attorney Fee related to Coventry Manor Apartment. As a result of this transaction, Rappaport was paid $16,250.

On or around April 19, 2022, a wire transfer was initiated from the Attorney Trust Account of Rappaport to Buyer #1's company. The wire transfer was in the amount of $335,367.93, which was the same amount the parties agreed would be paid outside of closing without Bank B's knowledge, and the same amount reflected on the HUD-1 Settlement Statement as a "Seller Fee," payable to the Rappaport's law firm.

As of the date of this plea agreement, the latest tax assessment of Coventry Manor was sufficient so that, were the properties sold for that value, there would not be a loss to Bank B.

### Residential Home Wholesale

In addition to purchasing and managing multi-family apartment complexes, Schultz and Person #1 were in the business of wholesaling portfolios of residential homes. Schultz and Person #1 would identify homes being sold for under market value and place contracts on these residences. During the period between the contract ratification and settlement, Schultz and Person #1 would

find a third-party buyer to purchase the residential home portfolio at or near market value, thus creating a profit for Schultz and Person #1. The settlements for these transactions usually took place on the same day; therefore, Schultz and Person #1 would own the properties for only a short period of time.

Lender A is a private real estate lender based in New York, New York. Lender A mainly provides financing products for real estate investors. In or around September 2021, Schultz and Person #1 identified 42 residential homes near each other in Baltimore, Maryland being sold by various sellers. Schultz and Person #1, with the assistance of Rappaport, negotiated a contract sales price of $87,500 per home or $3,675,000 collectively.

Schultz and Person #1 agreed to sell the 42 residential homes to Buyer #2. The agreed upon purchase price of the properties was $112,500 per home or $4,725,000 collectively. Schultz, Person #1, and Buyer #2 agreed to fraudulently inflate the purchase price to $165,000 per home or $6,930,000 collectively. The purpose of fraudulently inflating the purchase price was to provide Buyer #2 with 100 percent financing from Lender A.

Schultz, Person #1, and Buyer #2 agreed to provide Lender A with the fraudulently inflated purchase price of $165,000 per home or $6,930,000 collectively.  Lender A was not told that the true purchase price was $112,500 per home or $4,725,000 collectively. The true purchase price and down payment were material terms to Lender A's loan decision. Buyer #2 was required to provide a down payment of approximately $2 million at closing, however, he did not have funds available. Unbeknown to Lender A, Buyer #2 devised a scheme to produce "show money" that would be provided to the settlement company to satisfy the down payment requirement. Buyer #2 arranged to borrow the funds required. Further, Rappaport, Schultz, Person #1, and Buyer #2 agreed that the $2 million would be returned to Buyer #2's source of funds after the closing without

the knowledge of the lender or Settlement Company. To complete the scheme, Rappaport agreed to receive the $2 million from the Settlement Company into Rappaport's Attorney Trust Account, then return the funds to Buyer #2's source of funds, thus concealing the source of the $2 million from the settlement company and Lender A.

On or around December 9, 2021, Schultz and Person #1 purchased the 42 residential homes for $3,675,000. Schultz and Person #1 then sold the 42 residential homes to Buyer #2 on the same day for $6,930,000. To fund the purchase of the 42 residential homes, Buyer #2 received two loans from the Lender in the collective amount of $5,236,000. The HUD-1 Settlement Statement reflected that Buyer #2 provided $1,931,545.96 as a down payment and Schultz and Person #1 received $2,921,604.09 from the sale. As a result of this transaction, Rappaport was paid $5,500.

On or around December 13, 2021, the Settlement Company wired approximately $2.8 million to Rappaport's Attorney Trust Account via two wire transfers. The wire transfer details stated that the wire transfer was for, "Seller Proceeds." On the same day, a wire transfer in the amount of $2,024,000 was initiated from Rappaport's Attorney Trust Account to Buyer #2's source of funds.

## II.    SENTENCING GUIDELINES CALCULATION

Pursuant to United States Sentencing Guidelines (U.S.S.G.) § 2B1.1(a)(1)(A) and (b), the base offense level is 7 for a violation of 18 U.S.C. § 1349. Pursuant to U,S.S.G. § 2B1.1(b)(1)(A), because, as of the current date, the latest tax assessment of Coventry Manor was sufficient so that, were the properties sold for that value, there would not be a loss to Bank B, and the 42 properties that compromised the Residential Home Wholesale transactions were subsequently sold without a loss, meaning there is no financial loss in this case. The offense level is increased an additional 2 points because the defendant abused a position of public or private trust, or used a special skill, in

a manner that significantly facilitated the commission or concealment of the offense. The Defendant is due a 2-level reduction in offense level pursuant to U.S.S.G. §3E1.1(a) based on his prompt acceptance of responsibility. The Defendant further appears eligible for an adjustment for being a zero-point offender under U.S.S.G. § 4C1.1. Given a Criminal History Category I and an offense level of 5, the Guidelines range is between 0 and 6 months, though for reasons discussed below, this range is not commensurate with the Defendant's crime.

## III.    SENTENCING RECOMMENDATION

"In sentencing a Defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of Defendant as set forth in the guidelines.' 18 U.S.C. § 3553(a)(4)(A)." Regarding sentencing, the Supreme Court states, "the Guidelines should be the starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines are the "natural starting point from which the sentencing court exercises its discretion under § 3553(a). *United States v. Langford*, 516 F.3d 205, 212 (3d Cir.2008). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual Defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the Defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the Defendant; and to provide the Defendant with needed education or vocational training, medical care, or other

corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Another factor that Section 3553(a) considers are similar sentences for similarly situated Defendants for to avoid sentence disparities. 18 U.S.C. § 3553(a)(6).

Notwithstanding the above, decades ago, the Supreme Court recognized the special character of criminal sentencing proceedings:

> Highly relevant—if not essential—to [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigorous adherence to restrictive rules of evidence properly applicable to the trial.

*Williams v. State of New York*, 337 U.S. 241, 247 (1949) (Black, J.). That principle has been codified for sentencing proceedings in the federal criminal courts by 18 U.S.C. § 3661, which provides that: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

### A. The Nature and Circumstances of the offense and the Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

While the Sentencing Guidelines range calculation for the Defendant's count of conviction is low, that should not detract from the seriousness of the Defendant's crime, which is why the parties have agreed to a sentence of 15 months. Essentially, the Guidelines calculation reflects the benefit received by the Defendant from a strong real estate market, and not the harm his crime posed. Through his actions he still has brought shame on the legal profession and created a substantial risk to the financial market.

8

It is certainly true that one risky loan may not cause a bank to collapse, or a market to crash. In fact, lies in mortgage applications often go unseen if market conditions cooperate. However, high-risk loans based on faulty valuations and minor lies about borrower qualifications that spread widely across the country were significant contributing factors to the 2008 financial crisis in this country. The type of behavior engaged in by the members of this conspiracy therefore still represents a serious risk to the market. Just because the bet worked out for the conspirators does not mean that it was a bet the lender wanted to make. Lenders have a right to be given complete information for the purpose of underwriting a loan and assessing the risk. The reason banks ask a borrower for a downpayment is because it demonstrates that the borrower understands and accepts some of the risk and takes some of that risk on themselves.

Moreover, it is the Government's position that this case could have been prosecuted as money laundering offense, which likely would have resulted in a higher Guidelines sentence under U.S.S.G. §2S1.1. Under that Guidelines, which begins at an Offense Level 8, the Guidelines would have been increased based on the total amount of funds laundered, regardless of ultimate loss. The agreed-upon sentence of 15 months takes this, as well as the other §3553(a) factors into consideration. It is therefore the appropriate sentence.

Particularly serious in this case is the Defendant's role as a lawyer in this scheme. It is axiomatic that an ethical lawyer avoids counseling his clients to commit a crime, and that he certainly should not facilitate that crime. In fact, the original lawyer representing the buyer of the Coventry Manor declined to participate in the fraud when the lawyer became aware of what was occurring, demonstrating that the Defendant's crime was not just the cost of doing business. Not only did Defendant Rappaport choose to participate in the Coventry Manor transaction, but he took the following actions:

- He counseled the co-conspirators on how to conduct their fraud by hiding addition funds that were not actually part of the purchase price.

- He drafted a side-contract hidden from the lender that codified the fraud and protected the interests of the co-conspirators.

- When the buyer's lawyer declined to participate in the transaction, he helped to find a lawyer who would participate.

- He used his Attorney Trust account to facilitate the unlawful transfer of funds.

A great deal of trust and responsibility is placed in the hands of lawyers in this country. They hold important jobs and can accomplish great things on behalf of their clients. Each time a lawyer uses his skills and the trust placed in him to commit a crime therefore has a reverberating damage that extends beyond the crime he commits. It denigrates the profession as a whole and causes citizens to lose trust in lawyers. Therefore, the Defendant's crime is more serious than simply lying to a lender to get a more favorable financial deal. It represents an abuse of the public's trust.

**B. The Need for the Sentence to Provide Adequate Deterrence and the Need to Protect the Public.**

While the Defendant has not yet filed his sentencing submission, there are certainly individual characteristics of the Defendant that justify a lower sentence than other Defendants who may have committed similar crimes. Surely, he has done fine legal work in addition to the acts that bring him now before the Court. Moreover, he appears to have a loving family who will struggle because of this sentence. But it is also true that rarely does a lawyer who commits a crime come before a sentencing court without a list of good deeds to balance out his crime. Surely, a long list of friends and good acts cannot justify a crime and excuse its punishment. The agreed-upon

sentence is no greater than necessary when these factors are balanced with the seriousness of the offense and the need for deterrence.

Deterrence, both specific and general, is needed here. The agreed-upon facts demonstrate that this crime was not a single bad day or one-off transaction. The first known violation by the Defendant came in the Residential Home Wholesale transaction. This transaction mirrored the later Coventry Manor transaction in that the parties agreed to fraudulently inflate the purchase price to obtain a loan without the required down payment. In this case, Defendant Rappaport was well-aware that the buyer came to closing with $2 million in "show money" temporarily loaned by another party that would make the lender believe a downpayment had been made. Defendant Rappaport agreed to receive the $2 million from the Settlement Company into his Attorney Trust Account, then return the funds to the buyer's source of funds, thus concealing the source of the $2 million from the settlement company and the lender. The Residential Home Wholesale transaction occurred before the Coventry Manor transaction and represented the same significant risk to a different lender as well as the same abuse of trust by Defendant Rappaport. This shows that the Defendant did not just have a single lapse in judgment. It also justifies a sentence of incarceration for the purpose of his specific deterrence.

While the Defendant may claim that the shame of this prosecution and the potential loss of his law license may be punishment enough, there is also a need for general deterrence in this case. Lawyers across the country take part in real estate transactions daily. Many may be of the opinion that, were their clients to take similar risks without disclosing those risks to the lender that they may be able to get away with it or that the punishment may be light. The Court has the opportunity to send a message with its sentence in this case to other lawyers similarly situated to Defendant

Rappaport that this crime is itself a risk not worth taking. A sentence of 15 months sends that message.

## CONCLUSION

The Government respectfully requests the Court sentence the Defendant to a term of incarceration of 15 months, the sentence agreed upon by the parties pursuant to the plea agreement. Such a sentence is supported by the factors found in 18 U.S.C. § 3553(a), and appropriate in this case.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _____
    Sean R. Delaney
    Assistant United States Attorney

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on June 9, 2026, a copy of the foregoing Motion to Seal was delivered via ECF to counsel for the Defendant.


By:    _____

Sean R. Delaney
Assistant United States Attorney