## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

United States of America

v.

Jacob Rappaport

　　　　Defendant

No. MJM-26-00096

_____

## DEFENDANT'S SENTENCING MEMORANDUM

*"Truly upstanding member of the community."*

*"Compassion, generosity and genuine concern for others who are struggling."*

*"Deeply involved in charitable and community causes."*

*"His commitment to the wellbeing of others is genuine and deep."*

*"Committed to his faith and actively involved in the Jewish community."*

*"Someone people can depend on in times of need."*

*"Driven by a sincere desire to help people and do what is right."*

*"Served with love, dedication and selflessness."*

*"Has a big heart that has only grown through his challenges."*

*"Hard working, caring, respectful of and attentive to his elders, humble and reliable."*

*"Loyal, compassionate, and willing to go out of his way for others."*

*"Man of genuine warmth, integrity and deep commitment to his family."*

*"Honorable, compassionate and deeply community-oriented."*

*"Tireless fundraiser for communal causes."* [1]

---

[1] *See* Ex. A, Character Letters in Support of Jacob Rappaport.

These are the words of those who know Jacob Rappaport best and choose to describe him.  He has taken full responsibility for his conduct and is sincerely remorseful and embarrassed for the actions that led to his conviction in this case. This conduct, borne out of a desire to assist his clients in business transactions, has now placed his family, including his wife and five children (with one more on the way), at significant emotional and financial risk.  He has lost his partnership with a respected Maryland law firm.

The plea agreement in this case does not contain a stipulation with respect to a specific loss calculation under the advisory Sentencing Guidelines.  Instead, the parties agreed that the loss calculation under 2B1.1 (b)(1) could be between 0 -12 levels depending on the actual loss.   It is now clear that the real estate transaction at the heart of this case has caused *no loss* to any financial institution or person.

We respectfully suggest that the negotiated sentence of fifteen (15) months is an appropriate sentence in this case.

### A.    THE UNDERLYING CASE

The facts of this case as set forth in the plea agreement are straightforward and uncontested.

In December of 2021, Jacob Rappaport represented Alexander Schultz ("Schultz") and another client (Person 1) in a real estate transaction in which his clients agreed to sell an apartment complex (Coventry Manor) to a willing buyer

(Buyer #1).  In this transaction, Buyer #1 assumed the loan that Rappaport's clients had obtained, previously secured by the property.

The true purchase price for Coventry Manor in this transaction was $6.9 million, despite the sales contract showing a purchase price of $7.8 million.  The buyers and sellers both agreed to create a side contract that discussed seller credits to account for the difference between the $7.8 million contract price and the $6.9 million true contract price. When the credits proved insufficient to account for the difference, the delta was wired to the buyer after closing. The transaction made it appear that the lender had greater security in the transaction given the larger sales price.

As a result of the sale, Mr. Schultz and Person #1 received approximately $700,000 in profit.  Mr. Rappaport's law firm received $16,250 in attorney fees.

Additionally, despite the misrepresentations, Bank B's loan assumed by the buyers is being paid timely and the value of the property is more than sufficient to provide Bank B with adequate security in the event of a loan default.

### ***Relevant Conduct***

As part of the plea agreement in this case, Mr. Rappaport has also admitted to representing Alexander Schultz and Person #1 in an additional transaction that involved similar misrepresentations to a lender.  In that case, Mr. Schultz and Person #1 agreed to sell a package of 42 residential homes in Baltimore to a willing purchaser for $4.725 million.  After the deal was struck, Mr. Schultz, Person #1 and the buyer all agreed amongst themselves to falsely inflate the sales price to $6.93

million, thus appearing to increase the lender's security and allowing the buyer to receive essentially 100% financing on the deal.  The parties also agreed that the buyer would make a fictitious down payment of approximately $2 million using money belonging to a source who expected the funds to be repaid instantly after settlement of the transaction.

Mr. Rappaport assisted with sending back the $2 million after closing.  Mr. Rappaport's firm received $5,500 in standard legal fees.  But in both cases, the plan to inflate the purchase price to facilitate the transaction was designed by Mr. Rappaport's clients along with the buyers.

## B.    BACKGROUND

### 1.    *Upbringing*

Jacob Rappaport is a 41-year-old resident of Baltimore County, Maryland. He was raised by his parents in a modest duplex on Labyrinth Road in Baltimore along with four siblings.



Rappaport household in Pikesville (left side)

Mr. Rappaport lived in the family residence until he married at the age of twenty-two (22).

Mr. Rappaport's father, ███████████████████████████████

███████████████████████    ███████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████    According to its website, WITS "has provided Jewish women with an undergraduate education leading to BA and BS degrees since 1998." *See https://www.wits.edu/about-us* .

Mr. Rappaport's parents have been active in the community their entire lives. Moshe, a trained E.M.T., served as a volunteer at the Hatzalah of Baltimore for almost 15 years. Hatzalah is a network of volunteer emergency medical services (EMS) that provide free, rapid pre-hospital care and transport in local communities. Tova still serves as a volunteer life coach in the Jewish Community throughout Maryland.



Mr. Rappaport's brother, Avraham, ███████████████████████ ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████  █████████████████████████████████████████████████

████████████████████

## 2.    *Education*

Mr. Rappaport graduated from high school at the Bais HaMedrash and Mesivta of Baltimore in 2002.  After graduating, he studied at the Talmudic Research Center of Northern New Jersey from 2002-05.  Between 2005-07, he attended the Mir Yeshiva in Jerusalem, specializing in Talmudic Studies.

In 2010, after spending four years in Israel, Mr. Rappaport gained admission, and a full scholarship, to the University of Baltimore School of Law.  He graduated in 2012 with highest honors and passed the bar in July of that year.



Jacob & Bracha Rappaport at the UB Law School Graduation in 2012

Upon graduation from law school, Mr. Rappaport joined the Towson law firm Levin & Gann, where he specialized in Real Estate law.    In 2019, he was named a partner at the firm.    He remained as a tremendously successful partner at Levin & Gann until the charges were brought in this case.

3.    *Family*

In early 2007, Mr. Rappaport met his wife, Bracha, and the two married in June of that year.    The couple are currently raising five children between the ages of 6 to 18, with a sixth child due in August.













The Rappaport family is exceptionally close.   They live in a modest home (below) in Pikesville, and the house is more akin to a beehive at night.  All the children help around the house and help each other out as a team.



Jacob and Bracha are very active in each of their children's lives, with sports, dance recitals, concerts and events almost every night.



Rappaport children                                    Family at the beach

*4.      Community Involvement*

Mr. Rappaport follows in his parents' footsteps by helping others in the community.   As a young child between the ages of 8-13, Mr. Rappaport assisted his father in delivering packages of food from Ahavas Yisrael Charity Fund to needy families in Pikesville.  He remembers running up to the recipient's door, leaving the food box and then running away after knocking on the door so as not to embarrass the family.

He continues this service to the Ahavas Yisrael Charity Fund today through assisting with their annual charity drive, in addition to being a donor and volunteer supporting their cause.

Mr. Rappaport also supports numerous other charitable and educational organizations including:

***Bais HaMedrash and Mesivta of Baltimore***  --  a local Jewish high school and post-high school. Mr. Rappaport serves on the school's advisory board and provides volunteer services, assisting in financial campaigns and budgeting.

***Jewels Inclusive School***   -- a school enabling children with developmental disabilities to be educated alongside typically developing peers in their community.  Mr. Rappaport assists in organizing capital campaigns and charitable drives.

***Ahavas Chaim*** --  a unique and lifesaving organization serving Jewish teens and young adults in the Baltimore community.  Mr. Rappaport assists in

12

organizing capital campaigns and charitable drives as well as providing *pro bono* legal services.

***Bikur Cholim of Baltimore*** – This is a charity that serves the needs of people facing illness in the Jewish Community.   Mr. Rappaport assists in fund raising and providing *pro bono* legal services.

As is clear from the numerous letters supporting Mr. Rappaport in this case, his desire to serve others in the community is matched only by his disdain for recognition.  He is a selfless, kind-hearted person who plays an important and ongoing role supporting those in need in his community.

## C.    SENTENCING FACTORS

The Guidelines are only advisory and are now but one of seven statutory factors to weigh when formulating a sentence. *See United States v. Booker*, 125 S. Ct. 738 (2005); 18 U.S.C. § 3553(a). Congress has set forth the factors a sentencing court must consider in determining a reasonable sentence, which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.

*United States v. Talley,* 431 F.3d 784, 786 (11th Cir. 2005) (summarizing 18 U.S.C. § 3553(a)).

13

Although the Guidelines are a "starting point," the guideline range is not mandatory and "[t]he Guidelines are not the only consideration." *Gall v. United States*, 552 U.S. 38, 49 (2007). Moreover, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). Additionally, a "'court's duty is always to sentence the defendant as he stands before the court on the day of sentencing.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (quoting *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000)).

As one district court has framed it, the "most fundamental flaw [of the Sentencing Guidelines] is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." *See* Terry Carter, *Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

## 1. *The Advisory Sentencing Guidelines*

Mr. Rappaport agrees with the sentencing guidelines findings set forth in the plea agreement. (ECF 10).   Specifically, the base offense level is seven (7) pursuant to §2B1.1(a)(1) of the guidelines.  Two (2) points are added pursuant to

§3B1.3 of the guidelines because Mr. Rappaport abused a position of trust that significantly facilitated the commission of the offense.

With respect to loss calculations under §2B1.1(b), the parties agreed that this enhancement was variable based on the amount of actual loss, and the plea agreement specifies an outer limit of twelve (12) to this enhancement because the loss could not, under any circumstance, exceed $550,000.  The plea agreement goes on to point out that "*as of the date of this agreement, there is no actual loss.*" (ECF 10 at p. 5).   The same holds true today.   The Coventry Manor loan is performing, and Bank B has adequate security to protect its interests in the event of a default.  Accordingly, there is no loss adjustment under §2B1.1(b)(1)(A) of the guidelines, and the Total Offense level in this case should be nine (9). [2]

Because Mr. Rappaport accepted responsibility for his actions in this case in a prompt and timely manner, the guideline level is reduced by two (2) points pursuant to §3E1.1(a).  Additionally, because Mr. Rappaport has no criminal history and because this case does not involve any aggravating factors, the offense level is reduced by two (2) levels pursuant to §4C1.1 of the guidelines.  Thus, the final adjusted offense level in this case should be five (5).

### 2. *The Nature and Seriousness of the Offense*

There is certainly no dispute that the pending charges are very serious.  It is important to remember, however, that this was a purely financial offense, designed

---

[2]    There is also no loss associated with the bulk home sale transaction set forth as relevant conduct in this case.

by Mr. Rappaport's clients and the buyer of Coventry Manor to convince Bank B to allow the buyers to assume the mortgage loan already in place on the property. Put another way, if Bank B had been made aware of the true purchase price, its only option would have been to deny the assumption of the loan, but the loan would have remained in place. This is not a situation where Bank B loaned money as a direct result of the misrepresentations as to the sales price of the property. The mortgage loan had already been made to Mr. Schultz and Person #1 long before the transaction in this case.

Additionally, unlike many financial crimes, Mr. Rappaport did not design or directly profit from the scheme, nor did he receive a predetermined portion of the proceeds as most co-conspirators do. [3] To the contrary, Mr. Schultz and Person #1 received the entire $665,000 proceeds from the sale of Coventry Manor. Mr. Rappaport received $16,250 in legal fees paid to his law firm – *monies which have been forfeited and paid back in full by Mr. Rappaport.*

### 3. *Just Punishment and Deterrence of Future Conduct*

One of the most important purposes of sentencing is "to protect the public from further crimes." 18 U.S.C. §3553(a)(2)(C). As a result of his conduct, Mr. Rappaport has lost his position at a highly respected law firm and will forfeit his law license. His family has been placed at tremendous financial risk. Because of his conduct, he will be unable to receive any professional or occupational licenses

---

[3]    The same holds true for the bulk home sales transaction described as relevant conduct.

that would allow him to obtain any employment as an attorney. Under these circumstances, there is no realistic chance that Mr. Rappaport will commit any offenses in the future, nor is there a need to protect the public from this defendant. *See United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993) (downward departure from sentencing guidelines appropriate where defendant EPA tester's livelihood was destroyed and he could not re-enter the testing profession to engage in further criminal activity.)

With respect to just punishment, Jacob Rappaport's fall from grace is a powerful and significant punishment in and of itself. As a result of his actions, he has lost the ability to enjoy a lucrative career in law that was unlimited in potential. He has lost a very significant income, retirement benefits, health insurance, and the ability to use his skills and expertise in the marketplace. As is obvious, it is tremendously difficult to maintain any type of meaningful employment with a criminal record. He has also placed his family in serious financial jeopardy in an already difficult economic climate. Frankly, the irreparable collateral consequences of his conviction are significant punishment in and of themselves. *See United States v. Speed Joyeros,* 204 F. Supp.2d 412, 440-41(E.D.N.Y. 2002) (downward departure warranted because of defendant's loss of business and effect on income and assets.)

4. *Nature and Characteristics of the Defendant*

Mr. Rappaport has no criminal record. He had a successful and distinguished career as an attorney in a respected law firm. He has always been a

17

hard-working person and the primary supporter in his family.   He is a caring person, dedicated to his wife, five children and community.   Despite the nature of the charges and the tremendously embarrassing sequence of events that form the basis for the charges in this case, his wife, family and friends support him unconditionally.

We have also provided the Court with a substantial series of letters (Exhibit A) from those who know him best.   These letters of support attest to Jacob Rappaport's character and integrity over time.   He is universally described as a kind-hearted person devoted to his family and to service for others.   The letters contain numerous anecdotes about Mr. Rappaport that, frankly, describe him better than any words laid out in a sentencing letter or a Presentence Report could. We would like, however, to highlight a few of the remarks for the Court's consideration.

Amiel Chicheportiche, who specializes in treating people in substance abuse rehabilitation programs, writes:

> *I work daily with individuals who are struggling to rebuild their lives.  Many of these individuals face significant legal challenges who often do not know where to turn for guidance.  Time and time again, . . . Jacob has responded without hesitation. He has consistently taken the time to guide people toward appropriate legal resources and help them navigate difficult situations.  He never asked for recognition or compensation; he simply wanted to help people in need.*

Yaakov Weinberger, a friend and client, writes:

> *What distinguished him [Jacob] most . . . was his genuine willingness to help – not as a function of business interest, but*

18

*as a reflection of who he is. . . I know independently that he has long been with local schools and community organizations – giving both his time and financial resources in ways that did not seek recognition.*

Jeffrey Gelberman, CEO of the Rocky Companies, writes:

*Jacob's children and my own attended the same after-school sports programs. Despite the significant demands on Jacob's time from his busy law practice, Jacob volunteered as a coach of our youth football league. . . . I watched him interact with the young children, teaching them not only the ins and outs of football, but the fundamentals of the proper way to play competitively, how to treat others, how to win, how to lose. I was amazed by how Jacob, in his understated, if not humble way, kept the kids excited and motivated. They loved him because they knew he cared deeply about them.*

Adam Koshkeraman, the manager of K&S Capital, and a friend, writes:

*What distinguished Yaakov (Hebrew for Jacob) beyond his professional excellence, however, is the generosity of his character. Yaakov has provided pro bono legal guidance in support of my charitable giving and has selflessly advised several nonprofit organizations with which I am involved. He asked for nothing in return. He simply gave up his time and expertise because he believed in the causes and in the people behind them. This is not a gesture one forgets.*

Rabbi Y. Zvi Weiss writes:

*Many times, I have called upon Jacob to assist with a community matter or to help an individual in need. His response was always the same: "Absolutely." He would then get to work and would not stop until the matter was taken care of.*

David Herman, a longtime family friend, writes:

*I am aware that he has assisted many people across the spectrum of the Baltimore community quite often dispensing legal advice pro bono. His reputation was stellar. . . [H]e is actively involved in community service. He volunteers for a food*

> ***bank known as Ahavas Yisroel and regularly contributes to an orphanage known as Boys Town Jerusalem.***

Neil Adler, a longtime friend of over 32 years, writes:

> ***Over the years, Jacob moved to Maryland and built a beautiful family. Although we were no longer living near each other . . . his caring nature never changed. I saw this in a very personal way when my father passed away. During my mourning period, I looked up and saw Jacob there. He travelled more than three hours simply to be present and comfort a friend. That moment meant a great deal to me, and it reflected the Jacob I have known for more than two decades – loyal, compassionate, and willing to go out of his way for others.***

Ari S. Casper, Managing Partner of the Casper Firm, former AUSA, and a member of this Court's bar for over 26 years, writes:

> ***Yaakov has consistently devoted his time, resources and energy to helping others often quietly and without seeking recognition. In all of my interactions with him, I have known him to be honorable, compassionate, and a deeply community-oriented person of strong moral character.***

Shaya Mintz is the Executive Director of Bikur Cholim of Baltimore, a charity serving persons facing illness in the Jewish Community. He writes:

> ***Recently, Bikur Cholim was given the opportunity to expand its capabilities in a new facility. We sincerely appreciated the time, effort and insight that Mr. Rappaport provided in advising us through the process. His work, completely pro bono, facilitated reaching an arrangement that was agreeable to all parties. We know that as an organization, we greatly benefitted from his selfless contribution, and the many patients and their families who will ultimately use this facility and will benefit as well.***

Rabbi Yisroel Fuchs, Executive Director of Jewels Inclusive School in Pikesville writes:

> ***Yaakov Rappaport is one of those individuals who answers the call when we need to raise funds for these precious children. . .Yaakov is the type of person who cares and is willing to take action to help those in need. He has been there for so many***

*people. His concern and love for those in need are legendary. Just as amazing is his disdain for recognition. The generosity is genuine and has no ulterior motives. Yaakov Rappaport is a truly upstanding member of the Baltimore Community.*

Viewing Jacob Rappaport's life in a larger context, his actions in this case mark what is clearly an outlier: the lowest point in an otherwise virtuous and exemplary life. The continued love and support from family, friends and the greater community reveal the type of successful and talented person that he is. This support also shows that he is not a person who will be back before the Court ever again in a negative way and who does not pose any threat to others. He has continued to do everything possible to help his children and family cope with the effects of his actions. *See also United States v. Howe*, 543 F.3d 128, 137 (relying on numerous factors to support a downward variance including that the defendant "led an honorable and lawful life until this point and had no prior criminal history," "was a 'well-regarded member of his community,'" and "was a 'devoted husband, father, and son.'").

While there is undeniably a need to punish the defendant for his actions, this punishment should be tempered by who he is and what he has done both before and after his actions in this case, as well as the significant punishment he has already suffered because of the charges in this case.

### D.    SENTENCING REQUEST

We submit that, under the unique circumstances of this case, especially Mr. Rappaport's lack of criminal history, the Court should impose the negotiated

21

sentence of fifteen (15) months.    Such a sentence would allow him to receive a significant punishment for his actions.  This sentence also balances the competing goals of sentencing as set forth in 18 U.S.C. § 3553 and is more than adequate, but not greater than necessary, to meet the sentencing goals of 18 U. S. C. §3553(a).

Respectfully submitted,


_____/s/_____
Andrew C. White
Federal Bar No. 08821
Silverman, Thompson, Slutkin & White, LLC
400 East Pratt Street, Suite 900
Baltimore, MD 21202
Telephone: 410-385-2225
awhite@silvermanthompson.com

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of June, 2026, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all parties:

_____/s/_____
Andrew C. White, Esquire
Federal Bar No. 08821
Silverman, Thompson, Slutkin & White, LLC
400 East Pratt Street, Suite 900
Baltimore, MD 21201
Telephone: 410-385-2225
Facsimile:  410-547-2432
awhite@silvermanthompson.com